UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GEORGE BELTRAN,

          Plaintiff,

    v.

PEOPLEREADY, INC., et al.,

          Defendants.

Case No.  3:23-cv-00179-WHO

**ORDER ON MOTION TO REMAND
AND MOTION TO COMPEL
ARBITRATION**

Re: Dkt. Nos. 10, 19

      This is a putative wage and hour class action filed by plaintiff George Beltran against his former employers, PeopleReady, Inc. and TrueBlue Inc. (collectively "the defendants").  The case was initially filed in state court and removed to federal court by the defendants.  At issue in this Order are Beltran's Motion to Remand and the defendants' Motion to Compel Arbitration.  For the following reasons, Beltran's motion is denied, and the defendants' motion will be addressed following limited discovery, further briefing and if needed an evidentiary hearing.

**BACKGROUND**

**I.**        **FACTUAL BACKGROUND**

      Plaintiff George Beltran filed this case against his former employers, PeopleReady and TrueBlue, asserting that the defendants violated various California state labor laws and California's Unfair Competition Law ("UCL").  Complaint ("Compl.") [Dkt. No. 1] Ex. D. Together the defendants are "an industrial staffing agency" that provided work for Beltran at various times during 2022.  *Id.* at ¶ 11.  Beltran is a citizen of California, *id.* ¶ 3, and PeopleReady and TrueBlue are both citizens of Washington and employ workers in California, *id.* ¶ 5.

      Beltran's complaint asserts that the defendants employ "hundreds" of non-exempt employees who "were not compensated under reporting time law, not provided accurate wage

statements, and were subject to unfair business practices." *Id.* ¶¶ 12-13. He asserts that he and putative class members "were scheduled to work shifts of at least 6 to 8 hours a day" but "were forced to leave work on or before the allotted time and only paid for 2 hours of work," in contravention of California law that requires reporting time pay of at least half the scheduled shift, up to a maximum of 4 hours. *Id.* ¶¶ 18, 31. Because of the defendants' failure to pay for reporting time, Beltran's "and Class Members' wage statements are inaccurate." *Id.* ¶ 20.

Beltran brings four causes of action on behalf of himself and all those similarly situated, all stemming from the alleged reporting time violations, alleging violations of: (1) the reporting time requirement under Industrial Welfare Commission ("IWC") Wage Orders 1-16 § 5(A); (2) California Labor Code sections 1194, 1194.2, and 1197 for failure to pay minimum wage; (3) California Labor Code section 226(a) for inaccurate wage statements; and (4) the UCL. *Id.* ¶¶ 29-61. Beltran defines his putative class as "[a]ll individuals employed by Defendants as non-exempt employees in the State of California, at any time within four years prior to the filing of this lawsuit until the present date." *Id.* ¶ 26(a). He seeks money damages, restitution, attorney fees and costs, and injunctive relief. *Id.* ¶¶ 33-34, 41, 47, 52, 55, 58.

## II.    PROCEDURAL BACKGROUND

Beltran filed his complaint in state court on November 7, 2022, and the defendants removed it to federal court on January 12, 2023. Notice of Removal [Dkt. No. 1]. Subsequently, Beltran filed a Motion to Remand. ("Remand Mot.") [Dkt. No. 19]. The defendants filed an opposition with supporting declarations. ("Remand Oppo.") [Dkt. No. 23]. Beltran replied. ("Remand Repl.") [Dkt. No. 25].

The defendants also filed a Motion to Compel Arbitration. ("Compel Mot.") [Dkt. No. 10]. Beltran opposed and filed several supporting exhibits, including declarations and two video files. ("Compel Oppo.") [Dkt. No. 20]. The defendants replied and filed supporting exhibits. ("Compel Repl.") [Dkt. No. 22].

I held a hearing on both motions at which counsel for both parties appeared.

United States District Court
Northern District of California

**LEGAL STANDARD**

## I.  MOTION TO REMAND

The Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), gives federal courts original jurisdiction over class actions where there are at least 100 class members, at least one plaintiff is diverse in citizenship from any defendant, and the amount in controversy exceeds $5,000,000, exclusive of interest and costs.  *Ibarra v. Manheim Investments, Inc.*, 775 F.3d 1193, 1195 (9th Cir. 2015).  A class action that meets CAFA standards may be removed to federal court.  28 U.S.C. § 1441(a).  Unlike the general presumption against removal, "no antiremoval presumption attends cases invoking CAFA."  *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 82 (2014).  Rather, Congress intended CAFA jurisdiction to be "interpreted expansively."  *Ibarra*, 775 F.3d at 1197.

With respect to the amount in controversy, "[a] removing defendant's notice of removal 'need not contain evidentiary submissions' but only plausible allegations of the jurisdictional elements."  *Arias v. Residence Inn by Marriott*, 936 F.3d 920, 922 (9th Cir. 2019) (quoting *Ibarra v. Manheim Investments, Inc.*, 775 F.3d 1193, 1197 (9th Cir. 2015)).  If the defendant's allegations of removal jurisdiction are challenged, "both sides submit proof" of the amount in controversy "and the court decides, by a preponderance of the evidence, whether the amount-in-controversy requirement has been satisfied."  *Dart Cherokee*, 574 U.S. at 82 (citing 28 U.S.C. § 1446(c)(2)(B)); *see also Fritsch v. Swift Transp. Co. of Ariz., LLC*, 899 F.3d 785, 793 (9th Cir. 2018) (clarifying that the defendant has the burden to establish by a preponderance of the evidence that the amount in controversy is met).

"[T]he defendant's showing on the amount in controversy may rely on reasonable assumptions."  *Arias*, 936 F.3d at 922 (citing *Ibarra*, 755 F.3d at 1197-99).  Such assumptions "need some reasonable ground underlying them" and "may be reasonable if [they are] founded on the allegations of the complaint."  *Id.* at 925 (citing *Ibarra*, 77 F.3d at 1198-99); *see also LaCross v. Knight Transp. Inc.*, 775 F.3d 1200, 1202 (9th Cir. 2015) ("[W]hen the defendant relies on a chain of reasoning that includes assumptions to satisfy its burden of proof, the chain of reasoning and its underlying assumptions must be reasonable ones." (citing *Ibarra*, 775 F.3d at 1199)).

3

## II.  MOTION TO COMPEL ARBITRATION

The Federal Arbitration Act ("FAA") governs motions to compel arbitration.  9 U.S.C. §§ 1 et seq.  Under the FAA, "the district court's role is limited to determining whether a valid arbitration agreement exists and, if so, whether the agreement encompasses the dispute at issue." *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004) (citation omitted).  Though there is a "liberal federal policy favoring arbitration agreements," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Co.*, 460 U.S. 1, 24-25 (1983), "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit," *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986).  Assessing whether the arbitration agreement was actually formed "may not be delegated to an arbitrator."  *Suski v. Coinbase, Inc.*, 55 F.4th 1227, 1230 (9th Cir. 2022) (citing *Ahlstrom v. DHI Mortg. Co.*, 21 F.4th 631, 635 (9th Cir. 2021)).

"Under FAA § 4, in response to a motion to compel arbitration, a district court shall 'hear the parties'" and determine whether the "making" of the arbitration agreement is in issue.  *Hansen v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 670 (9th Cir. 2021) (quoting 9 U.S.C. § 4).  District courts apply the summary judgment standard of Federal Rule of Civil Procedure ("FRCP") 56 to assess whether the making of the agreement is at issue, including assessing whether "there are genuine disputes of material fact as to whether the parties formed an arbitration agreement." *Id.* at 670, 672 (citations omitted).  If the court is "satisfied" that the making is not an issue, the court orders the parties to arbitration; if the making is in issue, "the court shall proceed summarily to the trial thereof."  *Id.* at 670 (quoting 9 U.S.C. § 4).

Where a party contests whether a valid contract was formed, courts "apply state-law principles of contract formation and interpretation."  *Suski*, 55 F.4th at 1230 (citing *Holl v. U.S. Dist. Court (In re Holl)*, 925 F.3d 1076, 1083 (9th Cir. 2019)).  "As the party moving to compel arbitration, Defendants bear 'the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence.'" *Tabas v. MoviePass, Inc.*, 401 F. Supp. 3d 928, 936 (N.D. Cal. 2019) (quoting *Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279, 1283 (9th Cir. 2017)).

4

**DISCUSSION**

## I.  MOTION TO REMAND

Beltran moves to remand this case to state court, arguing that removal was improper because the amount in controversy is not met under CAFA.[1]  The vast majority of his argument focuses on whether it was improper for the defendants to include 41,000 workers as potential class members in their calculations of the amount in controversy.  In turn, the defendants assert that Beltran's complaint shows that all of the workers could reasonably be considered as putative class members.

Beltran's complaint defines the relevant class as "All individuals employed by Defendants as non-exempt employees in the State of California, at any time within four years prior to the filing of this lawsuit until the present date."  Compl. ¶ 26(a).  He alleges that the defendants employed "hundreds" of non-exempt employees, *id.* ¶ 12, and that those non-exempt employees "were not compensated under reporting time law, not provided accurate wage statements, and were subject to unfair business practices," *id.* ¶ 13.  In the removal notice, though, the defendants submitted evidence that PeopleReady employed 41,000 "Temporary Associates" during the relevant four-year period.  Declaration of Vince Vargas ("Vargas Decl. I") [Dkt. No. 2].  In the opposition to the motion to remand, the defendants submitted evidence that PeopleReady Temporary Associates worked the following total pay periods per year at the following average rate of pay:

| Year | Total pay periods worked | Average rate of pay | Minimum wage[2] |
|------|--------------------------|---------------------|-----------------|
| 2019 | 292,718 | $14.41 | $12 |
| 2020 | 190,999 | $15.44 | $13 |
| 2021 | 219,345 | $16.63 | $14 |
| 2022 | 197,373 | $17.59 | $15 |

Declaration of Vince Vargas ("Vargas Decl. II") [Dkt. No. 23] Ex. 1 ¶ 4.

In opposition to the motion to remand, the defendants provide calculations of the available

---

[1] The parties do not contest the other two elements of CAFA jurisdiction, which are met.  *See Dart Cherokee*, 574 U.S. at 84-85.

[2] The defendants cite California Labor Code section 1182.12(b)(1)(B)-(F) for the minimum wage.

United States District Court
Northern District of California

1   damages for each cause of action alleged in the complaint.  *See* Remand Oppo. 10:5-12:6.  These

2   calculations are based on what they say are the total number of relevant employees (41,000) and

3   the pay periods worked each year, and assume a 20 percent violation rate.  Beltran makes three

4   main arguments about these calculations: (1) they are incorrect given the relevant statutes of

5   limitations; (2) Labor Code section 226 provides for actual damage *or* a $50 penalty; and (3) the

6   assumption that 41,000 employees suffered reporting time violations is unreasonable and

7   unsupported.

8       The relevant calculations are as follows.

9           **1.    Wage Order § 5 – Reporting Time Pay**

10      The parties do not dispute that § 5 of Wage Orders 1 through 16 applies to Beltran's

11  claims, though they do not discuss which specific Wage Order they rely on.[3]  Under this provision,

12  claims are subject to a three-year statute of limitations, *see* Cal. Code Civ. Proc. § 338(a), with an

13  extra year of unpaid wages available under the UCL, *see Cortez v. Purolator Air Filtration Prod.*

14  *Co.*, 23 Cal. 4th 163, 178-79, 999 P.2d 706, 716 (2000).

15      Under § 5, a worker who is required to and reports to a shift but is not put to work or

16  works for less than half the scheduled workday is then entitled to be paid for half the scheduled

17  hours and at least two hours but no more than four hours.  IWC Wage Order § 5(a).  Defendants

18  assume that each worker with a reporting time issue is entitled to one extra hour of pay, which is

19  based on Beltran's assertions that workers scheduled for shifts longer than four hours who

20  reported but did not work the full shift received only two hours of reporting time pay, rather than

21  the up to four hours of pay to which they were entitled.  The defendants' assumption is reasonable

22  because it is grounded in Beltran's complaint, *see Arias*, 936 F.3d at 925, and is conservative

23  given that at least some of those workers were entitled to at least four total hours of reporting time

24  pay.  The defendants also assume a twenty percent violation rate, rather than a violation in every

25  reporting period, which I explain below is reasonable.  Accordingly, the relevant calculation is:

26

27

28  [3] It appears that Wage Orders 1 through 16 all contain the same relevant language in § 5.

6

20% x [(292,718 x $14.41) + (190,999 x 15.44) + (219,345 x 16.63) + (197,373 x 17.59)]$^4$

= **$2,857,317.87**

### 2.   Labor Code sections 1194, 1194.2 – Failure to Pay Minimum Wage

Under section 1194, claims are subject to a three-year statute of limitations with an extra year of unpaid wages available under the UCL.  *See* Cal. Code Civ. Proc. § 338(a); *Cortez*, 999 P.2d at 716.  Under section 1194.2, claims are subject to a three-year statute of limitations.  *See* Cal. Code Civ. Proc. § 338(a).

These provisions entitle employees to recover minimum wage for all hours worked that were unpaid, and Beltran alleges that all class members are entitled to recover this pay for all unpaid reporting time.  The defendants' calculations assume that each worker with a reporting time issue is entitled to one hour of minimum wage pay, reduced to a 20 percent violation rate. The defendants also include a conservative assumption that the $12 minimum wage from 2019 applied to all years.  The relevant calculations are:

Section 1194: .2 x. [12 x (292,718 + 190,999 + 219,345 + 197,373)] = **$2,161,044**

Section 1194.2: .2 x. [12 x (190,999 + 219,345 + 197,373)] = **$1,458,520**

### 3.   Labor Code section 558 – Penalties for Violation of Labor Laws

Under section 558, claims are subject to a one-year statute of limitations and workers are entitled to $50 for the initial pay period in which they are underpaid, and $100 for subsequent pay periods.  Assuming a 20 percent violation rate and including the conservative estimate of only $50 per fine, the defendants' calculations are:

.2 x (197,373 x 50) = **$1,973,730**

$*$        $*$        $*$

Taken together, the total for these claims is **$8,450,611.87**, which far surpasses the $5 million requirement even without including damages for the section 226 claims.  *See* Remand

---

[4] It is unclear why the defendants used the average number of annual pay periods for this calculation instead of the actual pay periods and the defendants miscalculated the average number of annual pay periods as 175,766 instead of the true average (225,109).  I include the correct numbers in the above analysis and note that the amount in controversy is established even with the defendants' conservative miscalculations.

United States District Court
Northern District of California

United States District Court
Northern District of California

Oppo. 6:13-7:11 (asserting that the calculations for the section 226 are incorrect). It also surpasses the CAFA requirement without including attorney fees, which the defendants could have included in their calculations. *See Fritsch*, 899 F.3d at 794. And contrary to Beltran's arguments, the defendants apply the proper statute of limitation for each cause of action in their opposition, including the proper application of the UCL's statute of limitations, which allows for recovery of unpaid wages for a fourth year for several claims. *See Cortez*, 999 P.2d at 716.

Beltran's strongest argument concerns the total number of employees. The complaint asserts only that "hundreds" of employees suffered reporting time damages, *see* Compl. ¶ 18, so it is true that the inclusion of 41,000 employees in the calculations goes beyond the pleaded allegations. But in addition to looking to the complaint, the defendants are entitled to rely on "allegations in the removal petition as well as 'summary-judgment-type evidence relevant to the amount in controversy at the time of removal.'" *Fritsch*, 899 F.3d at 793 (quoting *Krosek v. U.S. Bank Corp.*, 432 F.3d 976, 980 (9th Cir. 2005)). And here, the defendants submitted two relevant declarations showing the total number of employees and the total pay periods worked per year to calculate the amount at stake in the litigation, as they were entitled to do. *See id.* Accordingly, the evidence itself of the total number of employees may properly be considered.

Beltran argues that the defendants' assumption that all 41,000 employees suffered a reporting time violation is unreasonable, and he points out that his complaint only seeks damages for claims related to the alleged reporting time violations. But he defines his class as "[a]ll" non-exempt employees from the past four years, Compl. ¶ 26(a), meaning the defendants' inclusion of all 41,000 employees is based on the complaint, *see Arias*, 936 F.3d at 925 ("As assumption may be reasonable if it is founded on the allegations of the complaint." (citing *Ibarra*, 775 F.3d at 1198-99)). Additionally, given that Beltran alleges the defendants frequently failed to pay the proper reporting time for scheduled 8- and 12-hour shifts, *see* Compl. ¶¶ 18-20, combined with the temporary nature of the positions to which they assign their workers, *see, e.g.*, Vargas Decl. I (describing PeopleReady as a "temporary staffing company" that provides "on-demand temporary labor"), it is not unreasonable to assume that all of the workers could have experienced the alleged violations. And, the defendants do not assume that every worker experienced a labor law violation

8

on every shift, but rather assume a 20 percent violation rate, which is reasonable when compared to other cases. *Cf. Ibarra*, 775 F.3d at 1198-99 (explaining that allegations of a "pattern and practice" do "not mean that such violations occurred in each and every shift"); *see also Chavez v. Pratt, LLC*, No. 19-CV-00719-NC, 2019 WL 1501576, at *3 (N.D. Cal. Apr. 5, 2019) (finding, in the context of meal and rest periods, that "[c]ourts in this . . . District[] have frequently upheld at least a 20% violation rate for purposes of CAFA amount in controversy allegations" (collecting cases)). Finally, despite Beltran's opportunity to present evidence challenging the factual bases of these assumptions, he does not do so—nor does he dispute that the total numbers of workers and pay periods are accurate. *See Salter v. Quality Carriers Inc.*, 974 F.3d 959, 964 (9th Cir. 2020) (noting the plaintiff's missed opportunity to submit declarations or evidence challenging the defendant's calculation of the amount in controversy).

These assumptions are particularly reasonable given that the amount in controversy "reflects the *maximum* recovery the plaintiff could reasonably recover" and is "simply an estimate of the total amount in dispute, not a prospective assessment of defendant's liability." *Arias*, 936 F.3d at 927 (citations omitted). Plainly, based on the allegations in the complaint and particularly the inclusion of *all* non-exempt employees in the definition of the class, it is possible and reasonable that Beltran and the class plaintiffs could recover for injuries to all of the employees. *See id.* Accordingly, the defendants' underlying assumptions in the calculations—that all 41,000 employees as well as 20 percent of pay periods were affected—are reasonable.

Finally, I note that Beltran repeatedly contests the use of the 41,000 figure but does not provide an alternative number besides the "hundreds" assertion in the complaint. The pay he received included reporting time pay for two of his three paychecks. It seems, then, that it would also be reasonable for the defendants to extrapolate this ratio and assume that two third of all paychecks it issued included reporting time pay. Even with that two-thirds number, the amount in controversy still surpasses $5 million.[5]

---

[5] The calculations would total **$5,633,742.65**, based on the following:
Wage Order § 5:
    .2 x [(195,145 x $14.41) + (127,333 x 15.44) + (146,230 x 16.63) + (131,582 x 17.59)] = **1,904,878.65**

United States District Court
Northern District of California

1   Accordingly, I find that defendants met their burden to establish the amount in controversy

2   by a preponderance of the evidence.  Given that was the only basis for contesting my jurisdiction

3   in this case, the motion to remand in DENIED.

4   **II.    MOTION TO COMPEL ARBITRATION**

5   The defendants move to compel arbitration, asserting that Beltran signed an arbitration

6   agreement that covers all claims asserted in this case, and submitting a copy of that agreement.[6]

7   *See* Compel Mot.  Beltran contests whether he consented to or signed the agreement, asserting that

8   while the contract appears to show his electronic signature, he was never given the opportunity to

9   see or review the document.  *See* Compel Oppo.  He does not dispute that the agreement would

10  cover all his asserted claims.  Accordingly, the sole issue in this Order is whether the agreement

11  was validly formed.

12  District courts apply the summary judgment standard of FRCP 56 to assess whether the

13  making of the agreement is at issue, including assessing whether "there are genuine disputes of

14  material fact as to whether the parties formed an arbitration agreement."  *Hansen*, 1 F.4th at 670,

15  672.  "As the party moving to compel arbitration, Defendants bear 'the burden of proving the

---

Labor Code section 1197:
.2 x. [12 x (195,145 + 127,333 + 146,230 + 131,582)] = **$1,440,696**
Labor Code section 1197.2:
.2 x. [12 x (127,333 + 146,230 + 131,582)] = **$972,348**
Labor Code section 558:
.2 x (131,582 x 50) = **$1,315,820**

[6] The agreement provides in relevant part:
AGREEMENT TO ARBITRATE:  The Company and I (together the "Parties")
agree that, <u>except as set forth in the Representative Action section</u>, any claim or
dispute between the Parties including, but not limited to any claim arising out of or
relating to this Agreement or breach of this Agreement, my employment,
application for employment, and/or termination of employment, or any other
matter, shall be submitted to an resolved by binding individual arbitration under the
Federal Arbitration Act ("FAA"). . . .
THE PARTIES AGREE THAT, EXCEPT AS SET FORTH BELOW IN THE
REPRESENTATIVE ACTION SECTION, THEY MAY BRING CLAIMS
AGAINST THE OTHER ONLY IN THEIR INDIVIDUAL CAPACITY AND
NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS
ACTION, OR COLLECTIVE ACTION. . . .
I understand that I am also provided the opportunity to opt out of this arbitration
agreement.  I understand that if I choose to opt out of this agreement I must do so,
in writing, by mailing a copy of my written request to opt out of this Agreement.
Decker Decl. Ex. A.

United States District Court
Northern District of California

10

existence of an agreement to arbitrate by a preponderance of the evidence.'" *Tabas*, 401 F. Supp. 3d at 936 (citation omitted).  "When a party opposes a motion to compel arbitration on the ground that no agreement to arbitrate was made, the court 'should give to the opposing party the benefit of all reasonable doubts and inferences that may arise.'" *Id.* (quoting *Sanford v. MemberWorks, Inc.*, 483 F.3d 956, 963 (9th Cir. 2007)).

Because Beltran disputes whether a valid contract was ever formed, I "apply state-law principles of contract formation and interpretation."  *Suski*, 55 F.4th at 1230 (citing *Holl v. U.S. Dist. Court (In re Holl)*, 925 F.3d 1076, 1083 (9th Cir. 2019)).   Under California law, there are four requirements to form a valid contract: (1) "[p]arties capable of contracting"; (2) "[t]heir consent"; (3) "[a] lawful object"; and (4) "[a] sufficient cause or consideration."  Cal. Civ. Code § 1150.  Here, the parties only contest whether there was mutual consent.  *See Colgate v. JUUL Labs, Inc.*, 402 F. Supp. 3d 728, 762 (N.D. Cal. 2019) ("Under California law, '[t]here is no contract until there is mutual consent of the parties.'" (quoting *Deleon v. Verizon Wireless, LLC*, 207 Cal. App. 4th 800, 813 (2012))).

"Whether the mutual consent necessary for contract formation exists 'is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings.'"  *Id.* (quoting Deleon, 207 Cal. App. 4th at 813).  Failure to learn the terms of the contract before signing does not show lack of consent and does not preclude contract formation, so long as the signing party is given a "reasonable opportunity to know of the character or essential terms of the proposed contract."  *Najarro v. Superior Ct.*, 70 Cal. App. 5th 871, 886 (2021), *as modified* (Oct. 22, 2021) (first quoting Rest. 2d Contracts, § 163, p. 443; and then citing *Rosenthal v. Great W. Fin. Sec. Corp.*, 14 Cal. 4th 394, 423, 926 P.2d 1061, 1078 (1996)).

In assessing mutual consent and ultimately the formation of the arbitration agreement, I have considered the evidence submitted by both parties.  Beltran submitted a video of a third-party investigator performing the job application process on the PeopleReady website in October 2022, which shows that the investigator was unable to view or download the arbitration agreement but could still submit the job application.  *See* Declaration of Alexis Haugland ("Haugland Decl.")

11

[Dkt. No. 20] Ex. 2 at Exs. A, B.  Beltran's declaration says that he applied through the website and that the third-party video reflects his experience when he applied in June 2022.  Declaration of George Beltran ("Beltran Decl.") [Dkt. No. 20] ¶¶ 2, 23-24.  However, it is undisputed that the video was recorded in October 2022 and that the malfunction shown on the video relates to a document dated August 2022.  *See* Haugland Decl. Exs. A, B.  Consequently, and despite Beltran's declaration to the contrary, it is not clear how the video could reflect Beltran's application process because it indisputably encompasses a wholly distinct time period and separate information.

Indeed, the defendants argue that Beltran instead applied through a separate application called JobStack which did not have the same technological issues as the website, and which required Beltran to review the arbitration agreement before signing and submitting his application.  *See* Declaration of Jeroen Decker ("Decker Decl.") [Dkt. No. 22] ¶¶ 3-5, 9.  The defendants' declaration says that Beltran reviewed and signed all of his job forms through JobStack, *id.* ¶ 8, and *Beltran's own exhibits* show that he used JobStack for signing employment related forms, Beltran Decl. Ex. B (showing a screenshot of a popup window from "JOBSTACK" explaining how to review and sign "PeopleReady Paperwork").

If Beltran applied through JobStack, the defendants' evidence strongly suggests that he had to open and review the arbitration agreement before signing the document and before finalizing his application.  *See* Decker Decl. ¶¶ 4, 6.  Combined with Beltran's electronic signature on the arbitration agreement, this is enough to establish consent.  *See Najarro*, 70 Cal. App. 5th at 886.  But the defendants' only evidence that Beltran applied through JobStack is the declaration saying that "[t]he records generated by [Beltran's] application demonstrate that [Beltran] applied, reviewed, and signed all necessary documents using JobStack. . . . There is no record of [Beltran's] use of [the PeopleReady website] interface."  Decker Decl. ¶ 5.  The defendants do not actually submit the records generated by the application to show that Beltran applied through JobStack.  Indeed, the record they submitted of Beltran's E-Signature Agreement appears to be produced by "PeopleReady.com," *id.* Ex. B, which contradicts their assertion that all documents Beltran signed came from Jobstack, *id.* ¶ 3.  Taken together, I am not persuaded this evidence is

12

1    enough for the defendants to show there is no genuine dispute of material fact concerning which

2    platform Beltran used to apply.  *See Hansen*, 1 F.4th at 672; *see also Tabas*, 401 F. Supp. 3d at

3    936 (noting it is the defendant's burden to prove the existence of the arbitration agreement).

4          The remaining relevant evidence includes the communications between Beltran and his

5    supervisor, Jesse Angeles.  Beltran's declaration says that he informed Angeles of the issues with

6    reporting time pay in October 2022, that Angeles replied that Beltran "had to take up the issue in

7    arbitration," that Beltran told Angeles he never reviewed or agreed to arbitration, and that Angeles

8    later told Beltran that PeopleReady had no record of him signing the agreement and so now had to

9    sign it or would be terminated.  Beltran Decl. ¶¶ 16, 18.  Beltran submitted what he calls a "true

10   and correct copy of the text message" that he sent to Angeles saying he would not sign the

11   arbitration agreement.[7]  *Id.* ¶ 20; *id.* Ex. A.  In turn, the defendants submit a declaration from

12   Angeles that says he never discussed arbitration or the arbitration agreement with Beltran, that he

13   never told Beltran he would be terminated for not signing the agreement, and that he never texted

14   with Beltran about the agreement.  Declaration of Jesse Angeles ("Angeles Decl.") [Dkt. No. 22]

15   ¶¶ 4-7.  Angeles also submitted "a true and correct copy of all text messages George Beltran sent

16   to [Angeles]" which does not show any messages about arbitration and does not include the

17   message that Beltran said he sent to Angeles.  *Id.* ¶ 8; *id.* Ex. 1.

18         Obviously, these declarations and text messages support very different interpretations of

19   the evidence.  However, neither declaration definitively establishes whether Beltran consented to

20   the arbitration agreement.  Indeed, even if Beltran's declaration is wholly accurate, it shows only

21

22   _____
     [7] The screenshot shows a paragraph of text that says the following:

23            This is George Beltran, I sent a message at 1:15 p.m. to confirm I am still interested
              in working on Sunday . . . but no one has responded back yet at 2:14 p.m. on Friday
24            . . .  Is the reason I am not being confirmed for work on Sunday . . . because I have
              not signed an arbitration agreement and now I am being terminated from
25            employment at PeopleReady?

26   There are many issues that call into question the authenticity of this screenshot.  It appears to show
     writing in a "notes"-type application.  There is no obvious recipient besides "Me."  There are
27   multiple layers to the screenshot showing different times and dates: the body of the message
     indicates it was sent at 2:14 p.m., the date of the first layer of the screenshot shows 2:49 p.m., the
28   date of second layer of the screenshot shows 3:02 p.m., and the bar at the top of the screenshot
     shows "7:42."  And most importantly, there is nothing in the declaration or exhibit to suggest this
     text comes from a messaging platform.

United States District Court
Northern District of California

1  that at the time he spoke with Angeles, he was unaware that he had signed an arbitration

2  agreement, which does not necessarily establish lack of consent, as consent does not require

3  actually reading a contract's terms.  *See Najarro*, 70 Cal. App. 5th at 886; *Rosenthal*, 926 P.2d at

4  1078.   I note, though, that Angeles' declaration calls into question the veracity of Beltran's

5  declaration: while the defendants' exhibit of the messages between Beltran and Angeles clearly

6  shows text messages (but does not show, for example, whether Angeles deleted any messages),

7  *see id.* Ex 1, Beltran's exhibit of the message he sent to Angeles does not appear to be a text

8  message at all, *see* Beltran Ex. A; *see also supra* n.7.

9          Accordingly, the evidence submitted concerning consent is contradictory.  However, on

10  this limited record I cannot say that there is a *genuine* dispute as to whether Beltran consented to

11  the agreement, given the obvious holes in each party's evidence.  *See Hansen*, 1 F.4th at 672.  And

12  particularly because the holes in Beltran's evidence are so pronounced, it is hard to say that there

13  are any "reasonable" doubts and inferences that can be resolved in his favor at this time.  *See*

14  *Tabas*, 401 F. Supp. 3d at 936.

15           Section 4 of the FAA provides that a district court "shall hear the parties" in response to a

16  motion to compel arbitration in order to determine whether an arbitration agreement was made.

17  *See also Hansen*, 1 F.4th at 670.  In line with the FAA and the Ninth Circuit's guidance in

18  *Hansen*, I will hold a hearing on August 23, 2023.  In anticipation of the hearing, the parties may

19  conduct limited discovery related to the alleged contract formation and violation.  The parties shall

20  submit supplemental briefs of no more than 10 pages and evidence to establish whether Beltran

21  consented or did not consent to the arbitration agreement by July 19, 2023, and may submit

22  oppositions of no more than 5 pages by August 2, 2023.  At the hearing, if there are no genuine

23  disputes of material fact I will rule on the motion to compel arbitration.  If genuine disputes

24  remain that cannot be resolved by a further evidentiary hearing, the question will go to a jury.

25                                              **CONCLUSION**

26          For those reasons, the motion to remand is DENIED.  The motion to compel arbitration

27

28

will be addressed following the hearing on August 23, 2023, at 2:00 p.m.

      **IT IS SO ORDERED.**

Dated: April 25, 2023

                         William H. Orrick
                         United States District Judge

United States District Court
Northern District of California

15